# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Shree Santram, LLC and Riddhi     :
Siddhi, LLC,     :
           Appellants     :
    :
        v.     :
    :
City of Wilkes-Barre Zoning     :    No. 739 C.D. 2019
Hearing Board     :    Argued: May 11, 2020


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                        FILED: June 5, 2020


Shree Santram, LLC and Riddhi Siddhi, LLC (collectively, Applicants) appeal from the Luzerne County Common Pleas Court's (trial court) May 10, 2019 order denying Applicants' appeal and affirming the City of Wilkes-Barre's (City) Zoning Hearing Board (ZHB) decision denying Applicants' application for a special exception (Application). Applicants present two issues for this Court's review: (1) whether the ZHB committed an error of law when it considered whether Applicants' proposed use for property located in a C-N Commercial Neighborhood District (C-N District) was compatible with the essential character of the abutting R-1 Residential Single-Family District (R-1 District); and (2) whether the ZHB abused its discretion when it denied Applicants' Application. After review, we reverse.

On June 2, 2016, Applicants filed the Application to change the nonconforming use of a drug store to a convenience store and a licensed beer store pursuant to the City's Zoning Ordinance (Ordinance) as a use not addressed in the

Ordinance. The property is located at 181 Old River Road in the City (Premises). On July 20, 2016, the ZHB held a public hearing on the Application.

At the hearing, liquor license consultant Roger Solar (Solar) explained that he is a general contractor who has consulted on 25-30 liquor licenses during the prior two years. *See* Reproduced Record (R.R.) at 53a. Solar recounted that he designed the plans for Applicants' proposed business and that the Premises is to consist of an unlicensed area selling convenience and grocery items, and a liquor-licensed area with seating for 30 patrons. *See* R.R. at 54a, 57a-58a. According to Solar, Applicants plan to sell hot dogs and sandwiches, malt and brewed beverages in 6-packs, 12-packs and single cans/bottles in the licensed portion of the Premises. *See* R.R. at 61a-62a. Solar expounded that Applicants will not offer any entertainment or music, and although alcohol will be sold primarily for consumption off the Premises, Applicants will not permit patrons to leave the Premises with open alcohol containers. *See* R.R. at 62a. He further stated that Applicants intend to operate the convenience store portion daily from 5:00 a.m. until 9:30 p.m., and the liquor-licensed portion from 7:00 a.m. until 9:30 p.m. each day. *See* R.R. at 60a-61a.

Solar noted that Applicants applied for a restaurant liquor license from the Pennsylvania Liquor Control Board (Liquor Board). *See* R.R. at 58a. Solar described the area in which the Premises is located as mostly residential with a few retail businesses, including the Riverside Café, located across the street from the Premises. *See* R.R. at 64a. Solar also recounted that the nearest school is 1,267 feet from the Premises. *See* R.R. at 65a. He testified that the Premises was formerly used as a pharmacy and there is public water and sewer service, adequate ingress and egress to the neighboring streets and available access for emergency vehicles. *See* R.R. at 65a-66a. Solar further explained that there are nine parking spaces on the building's exterior. *See* R.R. at 84a. He opined that the proposed business was harmonious with the other businesses and residences in the area:

2

> It's mostly a --- you know, it's a convenience store there, because, of course, it's that there is a ---. A third of the space is going to have the beer takeout, basically. Aside from that, two-thirds of the rest is a traditional convenience store with lottery sales, cigarette sales, soda, candies, chips --- pretty much anything you can find in a little corner convenience store that serves a little neighborhood.

R.R. at 66a-67a.

Solar further emphasized that the store will have no exterior signs advertising beer sales, and will not generate fumes, smoke, vapors, gases, or odors. *See* R.R. at 69a. Solar stated several factors would ensure minors would not have access to alcoholic beverages, including separation of the licensed portion of the premises from the convenience store area, prohibition of unaccompanied minors in the licensed area, mandatory identification card scanning for alcohol purchases, and Liquor Board Responsible Alcohol Management training and certification for all employees. *See* R.R. at 70a-72a.

Applicants' co-owner and manager Rajesh Patel (Patel)[1] related that he has been a City resident for seven years. *See* R.R. at 88a-89a. Patel stated that he has prior convenience store experience and has worked as a liquor-licensed gas station manager for the past four and one half years and has had no liquor license violations. *See* R.R. at 89a-90a. He described that he had purchased an identification scanning machine and implemented a policy of posting signs mandating identification to purchase alcoholic beverages and requiring identification scanning for all individuals appearing underage. *See* R.R. at 90a. Patel also declared that either he or his brother would be at the premises during all business hours, and that he planned to employ 10 people. *See* R.R. at 91a. Patel emphasized that he intends to prohibit patrons from consuming more than one alcoholic beverage inside the store, and will prohibit loitering outside. *See* R.R. at 93a, 95a.

---

[1] Patel's brother is Applicants' co-owner.

Area resident Ned Evans (Evans) explained that he is a school board member, but was appearing on his own behalf. *See* R.R. at 101a. As a former school principal, Evans explained his concerns about the likelihood of school children accessing alcohol. *See* R.R. at 102a-104a. Evans speculated that because children would be able to enter Applicants' business for food and other convenience items, they will be more likely to steal alcoholic beverages. *See* R.R. at 103a. Evans discounted the minors' potential access to the nearby Riverside Café, stating, "[t]hese kids know better than to go in [Riverside Café]. They just know better, but here, new occupants, new people -- and they're going to test it, and they're going to test it early." R.R. at 104a. Evans acknowledged that the Riverside Café similarly sells take-out beer. *See* R.R. at 106a. Area resident Heather Balester (Balester) expressed her general concerns for neighborhood children, and the likelihood of increased traffic, crime, and parking problems. *See* R.R. at 108a.

Riverside Café owner Bob Hogan (Hogan) explained that the Riverside Café does not "sell six-packs, but I mean, you could buy a six-pack. But you could not buy a bottle of beer and walk out, in a brown paper bag, and be drinking it." R.R. at 110a. He stated: "I'm not worried about the competition of this place. I don't think it'll be any bearing on me, but I am worried about the people that it's going to bring in." R.R. at 109a. Hogan expounded:

> We've all seen it. We've all rode [sic] through Wilkes-Barre in the different places that have had it, and luckily, you know, right here on the square you know, you have the Anthracite [Café], and we have the police force. We don't have the police force to be running down to south Wilkes-Barre where they're [sic] not needed, but they [sic] will be needed there constantly if we allow this.

4

R.R. at 110a. Hogan denied that the Riverside Café had ever been cited for Liquor Code[2] violations.[3] On cross-examination, Hogan admitted that Riverside Café has sold 6-packs for the last 12 years.

Joe Jacobs (Jacobs) testified that school bus stops for parochial and charter schools are located in front of the Premises and he is worried that patrons carrying alcohol will leave the premises when children are being dropped off. *See* R.R. at 115a-116a. Jacobs also expressed parking concerns and that the area schools' proximity to the Premises would increase the likelihood of underage drinking. *See* R.R. at 116a. He voiced confidence in Hogan's operation of the Riverside Café because Hogan has been responsive in addressing previous problems. *See* R.R. at 117a.

Theresa Spencer (Spencer), George Mesko (Mesko), Fontaine Grady (Grady), and Lindsey Tasco-Barker (Tasco-Barker) also objected to the Application. Spencer expressed concerns about increased traffic and childrens' safety and also agreed with the other objectors' concerns. *See* R.R. at 121a. Mesko revealed that he was present at the Liquor Board licensing hearing for the Premises. *See* R.R. at 123a. Spencer raised questions regarding the reasons that Applicants applied for a restaurant liquor license rather than a beer-only license. *See* R.R. at 123a-128a. Grady explained that he is a delivery driver and services convenience stores. He stated that such stores with liquor licenses attract the "wrong crowd." R.R. at 129a. He also expressed worries about Applicants' operations' effect on children and increased traffic. *See id.* Tasco-Barker similarly described her concerns regarding

---

[2] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1-101 - 10-1001.

[3] During the hearing, Applicants' attorney presented evidence that in 2008, the Riverside Café had indeed been fined $500.00 for possessing gambling devices and allowing gambling on the premises. *See* Section 5.32 of the Liquor Board's Regulations, 40 Pa. Code § 5.32 (prohibiting unlawful gambling associated with an activity on the licensed premises).

children, increased crime, traffic, parking and garbage resulting from Applicants' business. *See* R.R. at 131a.

At the hearing's close, the ZHB denied the Application. On July 21, 2016, the ZHB issued Applicants a denial letter. On August 17, 2016, Applicants appealed to the trial court. On September 1, 2016, the ZHB filed its Findings of Fact and Conclusions of Law (Findings and Conclusions). On May 10, 2019, the trial court affirmed the ZHB's decision. Applicants appealed to this Court.[4]

Initially, Section 324 of the Ordinance states:

> Whenever, in any district established under this Ordinance, **a use is neither specifically permitted nor denied** and an application is made by a landowner to the Zoning Officer for such use, the Zoning Officer shall refer the application to the [ZHB] and Planning Commission to hear and decide such request as a special exception. The [ZHB] shall have the authority to permit the use or deny the use in accordance with the standards governing special exception applications. The use may be permitted if it is similar to and compatible with permitted uses in the district and in no way is in conflict with the general purposes and intent of this Ordinance. **The burden of proof shall be upon the applicant to demonstrate that the proposed use would meet the standards and criteria for special exceptions as contained in Article 6 of this Ordinance and would not be detrimental to the public health, safety and welfare of the neighborhood.**

Ordinance § 324, R.R. at 32a (emphasis added). Section 1410.2 of the City's Ordinance provides in relevant part:

> The [ZHB] shall grant [special exception] approval only upon the determination that the proposed use and/or development conforms with all applicable standards and

---

[4] "In a land use appeal where common pleas does not take additional evidence, such as here, our review is limited to determining whether the [ZHB] abused its discretion or committed an error of law." *Marr Dev. Mifflinville, LLC v. Mifflin Twp. Zoning Hearing Bd.*, 166 A.3d 479, 482 n.3 (Pa. Cmwlth. 2017).

6

provisions within this Ordinance and the following expressed standards and criteria:

. . . .

2. Public services and facilities such as streets, sewers, water, police, and fire protection shall be adequate for the proposed use and/or development.

3. Existing streets and proposed access to the site shall be adequate regarding the width and pavement for emergency service vehicles.

4. Existing streets and proposed access to the site shall be adequate to accommodate anticipated traffic volumes in a manner that avoids undue traffic congestion, and provides for the safety and convenience of pedestrian and vehicular traffic. The proposed use shall not result in unsafe or dangerous traffic conditions.

5. **The proposed use shall be compatible with adjoining development and the character of the zoning district and neighborhood in which it is proposed to be located**. **The nature and intensity of the operation of the proposed use shall be considered regarding its compatibility or lack thereof**.

6. The proposed use shall not substantially impair the value of other property in the neighborhood where it is proposed to be located.

7. The proposed use and/or development shall not be more objectionable in its operations in terms of noise, fumes, odors, vibration, or lights that would be the operations of any permitted use in the subject Zoning District.

. . . .

9. The proposed use and/or development shall not be injurious to the public interest.

R.R. at 37a (emphasis added).

7

Applicants first contend that the ZHB erred by considering whether the proposed use was compatible with the R-1 District's character rather than that of the C-N District in which the Premises is proposed to be located.

Importantly, Section 1410.2(5) of the City's Ordinance requires that the proposed use "be compatible with adjoining development and the character of the zoning district **and neighborhood** in which it is proposed to be located." Ordinance § 1410.2(5), R.R. at 37a (emphasis added). Thus, although it is true that the proposed use is required to be compatible with the C-N District's character,[5] **it is also required to be compatible with the character of the neighborhood** in which it is located. It is undisputed that the proposed location is bordered on three sides by an R-1 District, making up a neighborhood of homes. Accordingly, the ZHB did not err in considering whether the use was compatible with the residential neighborhood directly abutting the proposed location.

Applicants next argue that the ZHB abused its discretion when it denied the application. This Court has explained that a zoning hearing board "abuses its discretion when its findings of fact are not supported by substantial evidence. Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Marr Dev. Mifflinville, LLC v. Mifflin Twp. Zoning Hearing Bd.*, 166 A.3d 479, 482 n.3 (Pa. Cmwlth. 2017) (citation and quotation marks omitted).

This Court has explained:

> Generally speaking, '[a] special exception is not an exception to a zoning ordinance, but rather a use which is expressly permitted, absent a showing of a detrimental effect on the

---

[5] The Ordinance explains: "The provisions for the C-N District are intended to create, preserve and enhance business areas to serve residential neighborhoods. They are generally districts which contain several small-scale retail establishments, in small clustered groupings, serving frequently recurring needs in locations convenient to residents." Ordinance § 404.

8

community.' *Manor Healthcare Corp. v. Lower Moreland* [*Twp.*] *Zoning Hearing* [*Bd.*], . . . 590 A.2d 65, 70 ([Pa. Cmwlth.] 1991). In other words, as stated in our seminal decision in *Bray v. Zoning Board of Adjustment*, . . . 410 A.2d 909, 911 ([Pa. Cmwlth.] 1980)[:] 'The important characteristic of a special exception is that it is a conditionally permitted use, legislatively allowed if the standards are met.' This Court recently explained that **an applicant for a special exception has** both **the duty of presenting evidence** and the burden of persuading the [zoning hearing board] **that the proposed use satisfies the objective requirements of the zoning ordinance** for the grant of special exception.

*Tower Access Grp., LLC v. S. Union Twp. Zoning Hearing Bd.*, 192 A.3d 291, 300 (Pa. Cmwlth. 2018) (emphasis added).

*Vineyard Oil & Gas Co. v. N. E. Twp. Zoning Hearing Bd.*, 215 A.3d 77, 85 (Pa. Cmwlth. 2019).

Once the applicant meets these burdens, a presumption arises that the use is consistent with the health, safety and general welfare of the community. The burden then normally shifts to the objectors of the application to present evidence and persuade the Board that the proposed use will have a generally detrimental effect. **Where, as here, however, the zoning ordinance specifically places the burden on the applicant to show that the proposed use will not have a detrimental effect, the applicant only retains the burden of persuasion**. **Objectors still retain the initial presentation burden with respect to the general matter of the detriment to health, safety and general welfare**. **The evidence presented by objectors must show a high probability that the use will generate adverse impacts not normally generated by this type of use, and that these impacts will pose a substantial threat to the health and safety of the community**.

*Freedom Healthcare Servs., Inc. v. Zoning Hearing Bd. of New Castle*, 983 A.2d 1286, 1291 (Pa. Cmwlth. 2009) (emphasis added; citation omitted).

9

In *Bray*, this Court distinguished burdens of presentation from burdens of persuasion. The *Bray* Court explained:

> [A]s to specific requirements of the zoning ordinance, the applicant has the persuasion burden, as well as the initial evidence presentation burden. The objectors have the initial evidence presentation duty with respect to the general matter of detriment to health, safety and general welfare, even if the ordinance has expressly placed the persuasion burden upon the applicant, where it remains if detriment is identified. Hence it appears that an ordinance provision placing the 'burden of proof' as to general police power detriment refers to the persuasion burden but, contrary to the rule that the initial evidence presentation duty follows persuasion burden, the nature of that subject matter requires that the evidence presentation duty be upon the objector in order to identify the facts-at-issue.

*Bray*, 410 A.2d at 912. Thus,

> [i]n outline form, the rules concerning initial evidence presentation duty (duty) and persuasion burden (burden) in special exception cases may be restated as follows:
>
> *Specific requirements*, e.g., categorical definition of the special exception as a use type or other matter, and objective standards governing such matter as a special exception and generally:
>
> The applicant has both the duty and the burden.
>
> *General detrimental effect*, e.g., to the health, safety and welfare of the neighborhood:
>
> Objectors have both the duty and the burden; the ordinance terms can place the burden on the applicant but cannot shift the duty.
>
> *General policy concern*, e.g., as to harmony with the spirit, intent or purpose of the ordinance:
>
> Objectors have both the duty and the burden; the ordinance terms cannot place the burden on the applicant or shift the duty to the applicant.

*Id*. at 912-13 (citations omitted).

Applicants offered Solar's and Patel's testimony to meet their burden of demonstrating their proposed use met the Ordinance's specific requirements.[6] The ZHB did not conclude that Applicants did not meet their burden. Rather, the ZHB explained in its Findings and Conclusions that "[t]he [ZHB] finds and concludes that the property containing the proposed beer store use, <u>directly abuts an R-1 . . . [D]istrict on three sides</u> and is not compatible with the essential character of the R-1 . . . [D]istrict/neighborhood." R.R. at 13a (bold emphasis omitted). The ZHB's specific factual findings provide in pertinent part:

> 3) It is a fact that [t]he [ZHB] did not grant a special exception to the aforementioned property pursuant to [Applicants'] noncompliance with <u>criteria in 'Section 1410.2 [of the Ordinance] PROVISIONS FOR GRANTING A SPECIAL EXCEPTION APPROVAL'</u>
>
> (a) **The proposed State licensed beer store is not compatible [with] the essential character of the R-1 . . . [D]istrict/neighborhood. The beer store location next to a convenience store would create a more intensive use, increasing pedestrian traffic and vehicular parking demands not intended [for] the adjacent R-1 single-family residential neighborhood.** 'The provisions for the R-1 District are intended to create, preserve and enhance areas composed primarily of single-family residences built at a [sic] relatively lower densities. These districts are still stable and essentially in sound condition and should be protected from intrusion of uses and activities incompatible with the character of single-family areas.'
>
> 4) **It is a fact that the nature and intensity of the proposed beer store next to a convenience store would be more objectionable in terms of vehicular traffic creating more noise, fumes, odors, vibrations effecting residential properties in the vicinity, than the previous use as a drug store abutting an R-1 [D]istrict.**

---

[6] Notably, the ZHB made no credibility determinations in its Findings and Conclusions.

11

5) **It is a fact that the proposed beer store would be injurious to the public interest in protecting children from the exposure to the retail sale of alcohol products**, given the close proximity to neighborhood children and also to Meyers High School and Kistler Elementary [S]chool attended by children under 21 years of age. There are two parochial and charter school bus stops which pick[ ]up and drop[ ]off children in front of the proposed beer store. The close proximity to public schools, neighborhood children walking pas[t] a store selling alcohol products, increased vehicular and pedestrian traffic were also concerns pronounced by the . . . City Planning Commission. The Planning Commission's special exception review and recommendation to the [ZHB] was to deny the zoning appeal application of the proposed beer store.

6) It is a fact that on May 20, 2015[,] the [ZHB] did not set precedent by approving [Riverside Café's] 12[-]seat expansion of an existing nonconforming tavern use. The tavern use is significantly different from a beer store which permits customers to purchase single cans/bottles of beer/malt liquor.

R.R. at 13a-14a (bold emphasis added).

Importantly, after a thorough review of the record, the objectors' general and speculative testimony is the only record evidence supporting many of the ZHB's factual determinations. "The law is clear that objectors to a special exception . . . 'cannot meet their burden by merely speculating as to possible harm . . . .'" *Marquise Inv., Inc. v. City of Pittsburgh*, 11 A.3d 607, 615 (Pa. Cmwlth. 2010) (quoting *Rural Area Concerned Citizens, Inc. v. Fayette Cty. Zoning Hearing Bd.*, 646 A.2d 717, 722 (Pa. Cmwlth. 1994)); *see also Boston Concessions Grp., Inc. v. Logan Twp. Bd. of Supervisors*, 815 A.2d 8 (Pa. Cmwlth. 2002) (testimony conveying general fears and not providing specific details is not considered substantial evidence).

Other than the objectors' speculative testimony expressing generalized concerns, there is no record evidence supporting the ZHB's finding that "[t]he beer store location next to a convenience store would create a more intensive use,

12

increasing pedestrian traffic and vehicular parking demands not intended [for] the adjacent R-1 single-family residential neighborhood." R.R. at 14a, Finding of Fact 3(a). Similarly, apart from the objectors' speculative worries, there is no support in the record for the ZHB's finding that "the nature and intensity of the proposed beer store next to a convenience store would be more objectionable in terms of vehicular traffic creating more noise, fumes, odors, vibrations effecting [sic] residential properties in the vicinity, than the previous use as a drug store abutting an R-1 . . . [D]istrict." R.R. at 14a, Finding of Fact 4. In fact, this finding directly contradicts Solar's testimony. *See* R.R. at 69a.[7]

---

[7] This Court further notes that "an increase in traffic is generally not grounds for denial of a special exception unless there is a high probability that the proposed use will generate traffic not normally generated by that type of use and that the abnormal traffic threatens safety." *Accelerated Enters., Inc. v. Hazle Twp. Zoning Hearing Bd.*, 773 A.2d 824, 827 (Pa. Cmwlth. 2001). Here, the proposed use is for a property in a C-N District which district is "intended to create, preserve and enhance business areas to serve residential neighborhoods[,] [and] contain several small-scale retail establishments, in small clustered groupings, serving frequently recurring needs in locations convenient to residents." Ordinance § 404. It is logical to presume that a C-N District in which businesses operate to serve the residential district increases traffic in the residential district, and thus, such a traffic increase is not incompatible with the character of a residential area.

The Pennsylvania Supreme Court has stated:

> The anticipated increase in traffic must be of such character that it bears a *substantial* relation to the health and safety of the community. A prevision of the effect of such an increase in traffic must indicate that not only is there a likelihood but a high degree of probability that it will affect the safety and health of the community, and such prevision must be based on evidence sufficient for the purpose. Until such strong degree of probability is evidenced by legally sufficient testimony[,] no court should act in such a way as to deprive a landowner of the otherwise legitimate use of his land.

> *Appeal of O'Hara*, . . . 131 A.2d 587, 596 ([Pa.] 1957). When what is presented by objectors is a mere 'speculation of possible harms,' they

13

Further, the record evidence does not support the ZHB's finding that "[i]t is a fact that the proposed beer store would be injurious to the public interest in protecting children from the exposure to the retail sale of alcohol products, given the close proximity to neighborhood children and [area schools]." R.R. at 69a, Finding of Fact 5. "[O]ur legislature has established the principle that a [liquor-]licensed establishment is not ordinarily detrimental to the welfare, health and morals of the inhabitants of the neighborhood." *Boston Concessions*, 815 A.2d at 13 (quoting *SSEN, Inc. v. Borough Council of Eddystone*, 810 A.2d 200, 208 (Pa. Cmwlth. 2002)). Moreover, there is no record evidence demonstrating that the manner in which Applicants plan to operate their establishment will endanger children, that Applicants' members' prior conduct reflects irresponsible operations or that Applicants' members have previously sold alcohol to minors.[8] Because the ZHB's factual findings were unsupported by substantial evidence, the ZHB abused its discretion when it denied the Application.[9]

For all of the above reasons, the trial court's order is reversed.

_____
ANNE E. COVEY, Judge

---

have failed to meet their burden. *Accelerated Enters., Inc.*, 773 A.2d at 826.

*Marquise Inv.*, 11 A.3d at 617-18. Here, no traffic study was offered, and the objectors testified only to generalized speculative fears of increased traffic.

[8] Further, the Liquor Board is granted discretion to deny the issuance of a license located within 300 feet of a school, and in the instant matter, approved the issuance of the license on a prior-approval basis. *See* Section 404 of the Liquor Code, 47 P.S. § 4-404. Here, the record evidence reflects that the nearest school is 1,267 feet from the Premises.

[9] In further support of their argument that the ZHB abused its discretion, Applicants contend that the ZHB set precedent when, on May 20, 2015, the ZHB approved Riverside Café's application for a 12-seat existing nonconforming tavern use expansion, and accordingly, the ZHB was required to approve Applicants' Application. Given this Court's disposition of this matter, we need not address this issue.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Shree Santram, LLC and Riddhi      :
Siddhi, LLC,                              :
                      Appellants   :
                                :
              v.                :
                                :
City of Wilkes-Barre Zoning      :    No. 739 C.D. 2019
Hearing Board                 :

## O R D E R

AND NOW, this 5th day of June, 2020, the Luzerne County Common Pleas Court's May 10, 2019 order is reversed and the matter is remanded to the trial court to reverse the decision of the City of Wilkes-Barre Zoning Hearing Board.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge